UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Towanda Velez, as personal representative of the estate
of Anthony Velez, deceased,

**Plaintiff**,

- against -

City of New York, Rudolph Hall, Michael Ruggiero,
and J. Does 1-8,

**Defendants.**

04 CV 1775 (ENV)(MDG)

# Plaintiff's Objections to Defendants' Application for Costs

**Of Counsel:**

Michael G. O'Neill
Theresa B. Wade

1

# Table of Contents

Table of Contents................................................................................................2

Authorities Cited.................................................................................................3

Procedural Background.........................................................................................4

Plaintiff's Objections............................................................................................5

The Law Applicable To A Rule 54 Request for Fees And Costs ............................6

Argument.............................................................................................................7
Point 1:  The Daily Trial Transcripts Were Not "Necessarily Obtained" for Use By
        Defendants In This Court ........................................................................7
Point 2:  Defendants Are Not Entitled to Costs for Second Copies of the
        Deposition Transcripts............................................................................10
Point 3:  Defendants Are Not Entitled to Costs for Court Reporter "Appearance
        Fee" ......................................................................................................10

Conclusion...........................................................................................................11

Authorities Cited

# Cases

*Bilezikjian v. Baxter Healthcare Corp., 1999 WL 945522, at \*3 (S.D.N.Y., 1999)*...............8
*Bucalo v. East Hampton Union Free School Dist., 238 F.R.D. 126, 129 (E.D.N.Y. 2006)*..7
*Carmody v. City of New York, 2008 WL 3925196, at \*2 (S.D.N.Y. 2008)*.........................10
*Cohen v. Stephen Wise Free Synagogue, 1999 WL 672903, at \*2 (S.D.N.Y. 1999)*.............7
*Dehoust v. Baxter Healthcare Corp., 1999 WL 280243 (S.D.N.Y. 1999)*............................9
*Farberware Licensing Co. LLC v. Meyer Marketing Co., Ltd., 2009 WL 5173787, at \*5*
       *(S.D.N.Y. 2009)*.......................................................................................................11
*Galella v. Onassis, 487 F.2d 986, 999 (2d Cir. 1973)*...........................................................6
*Hamptons Locations, Inc. v. Rubens, 2010 WL 3522808 (E.D.N.Y. 2010)*.........................6
*im v. New York Mailers' Union Number 6, 1999 WL 674447, at \*2 (S.D.N.Y. 1999)*........11
*John & Kathryn v. Bd. of Educ. of Mount Vernon Pub. Sch., 891 F.Supp 122, 123*
       *(S.D.N.Y., 1995)*.....................................................................................................6
*Karmel v. City of New York, 2008 WL 216929, at \*3 (S.D.N.Y., 2008)*..............................8
*Natural Organics, Inc. v. Nutraceutifcal Corp., 2009 WL 2424188, at \*3 (S.D.N.Y. 2009)*6
*Williams v. Cablevision Systems Corp., 2000 WL 620215, at \*2, (S.D.N.Y. 2000)*............11

## Procedural Background

A verdict was rendered in defendants' favor and judgment was entered by the Clerk of the Court on September 30, 2011.  On October 28, 2011, defendants filed, inter alia, a Bill of Costs along with a Notice of Application for Costs.  According to defendants' Notice of Application for Costs, defendants intend to move this Court before the Judgement Clerk on November 23, 2011 at 10:00 a.m. for an order pursuant to Rule 54 of the Federal Rules of Civil Procedure and 28 U.S.C. §1921 granting fees and costs.  Plaintiff objects to defendants' application.

## Plaintiff's Objections

1)      Defendants' application for costs, including the Bill of Costs, is improper in that it identifies Towanda Velez in her individual capacity as the plaintiff and the party against whom defendants seek costs.   The plaintiff in this matter, however, as identified in the caption, is Towanda Velez, *as personal representative of the estate of Anthony Velez, deceased*.  Defendants' application should, therefore, should be amended to seek costs from plaintiff in her capacity as personal representative of the estate of Anthony Velez only and not in her individual capacity.

2)      Defendants have not and cannot demonstrate that the expedited, daily trial transcripts were "necessarily obtained" as required by Local Civil Rule 54.1. See Argument below.

3)      Defendants are not entitled to costs for a second copy of the deposition transcripts of witnesses Towanda Velez, Yolanda Young, and Cynthia Lindsey because Local Civil Rule 54.1 only provides costs for, where appropriate, the original deposition transcript, plus *one* copy.    See Argument below.

4)      Defendants are not entitled to costs for court reporter "appearance fees" that were incurred in connection with the depositions of witnesses Towanda Velez, Yolanda Young, and Cynthia Lindsey.  See Argument below.

## The Law Applicable To A Rule 54 Request for Fees And Costs

A party may file a request to tax costs within thirty days after the entry of final judgment pursuant to Local Civil Rule 54.1(a).  The party requesting costs is required to submit an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred.  *Local Civil Rule* 54.1(a).  "Initially, 'the burden is on the prevailing party to establish to the court's satisfaction that the taxation of costs is justified'." *Natural Organics, Inc. v. Nutraceutifcal Corp.*, 2009 WL 2424188, at *3 (S.D.N.Y. 2009)(quoting *John & Kathryn v. Bd. of Educ. of Mount Vernon Pub. Sch.*, 891 F.Supp 122, 123 (S.D.N.Y., 1995).  Included among the items that are taxable as costs are transcripts and depositions.  *Local Civil Rule* 54.1(c).  Specifically, the cost of a trial transcript that was "necessarily obtained for use in the court" is taxable, and the cost of an original deposition transcript, plus one copy, is taxable "if the deposition was used or received in evidence at trial, whether or not it was read in its entirety."  *Id*.

"To assess the losing party with the premium cost of daily transcripts, necessity-beyond the mere convenience of counsel-must be shown." *Galella v. Onassis*, 487 F.2d 986, 999 (2d Cir. 1973); see also *Hamptons Locations, Inc. v. Rubens*, 2010 WL 3522808 (E.D.N.Y. 2010); *Natural Organics, Inc. v. Nutraceutifcal Corp.*, 2009 WL 2424188, at *3 (S.D.N.Y. 2009).  Use of daily transcripts by the prevailing party during trial "does not *per se* establish that they were necessary...and mere convenience to counsel is insufficient to justify taxing the cost." *Hamptons Locations, Inc.*, 2010 WL 3522808 at *4 (quoting *Natural Organics, Inc.* , 2009 WL 2424188, at *3).  In other words, the mere fact that trial transcripts were used during trial does

6

not mean they were "necessarily obtained." *Bucalo v. East Hampton Union Free School Dist.*, 238 F.R.D. 126, 129 (E.D.N.Y. 2006).

## Argument

### Point 1: The Daily Trial Transcripts Were Not "Necessarily Obtained" for Use By Defendants In This Court

Defendants claim that they used the trial transcript at the close of plaintiff's case in favor of defendants' Rule 50 motion and that the cost of the daily trial transcripts were necessarily incurred pursuant to Local Civil Rule 54.1  Savino Dec. ¶¶13,16.  Defendants, however, have not and cannot demonstrate that the expedited trial transcripts were "necessarily obtained" for use by them in this Court as required by Local Civil Rule 54.1.

The relevant inquiry in determining whether defendants are entitled to premium costs for daily trial transcripts under Local Civil Rule 54.1 is whether the trial transcripts were *necessary* for defendants' use in the case.  *Id.* (*citing Cohen v. Stephen Wise Free Synagogue*, 1999 WL 672903, at *2 (S.D.N.Y. 1999).  "Determining whether daily trial transcripts were necessarily obtained is a factual inquiry, and such daily transcripts are *not customary*." *Natural Organics, Inc.*, 2009 WL 2424188, at *3 (emphasis added).  "Awarding the cost of an expedited transcript requires a heightened showing of the unique circumstances that demanded it." *Id.*  In determining whether daily trial transcripts were necessary under Local Civil Rule 54.1, courts have considered the following factors: 1) amount of representation, 2) whether the attorneys could have taken notes throughout the trial to prepare for cross examination, summation, and the jury charge, 3) the length of the trial, and 4) whether the complexity of

7

the case justified daily expedited trial transcripts.  See *Id; Bucalo*, 238 F.R.D. at 129.

First, there are no facts here to suggest that defendants' counsel could not take notes throughout the trial.  On the contrary, there is substantial reason to believe that defendants' counsel were more than capable of taking extensive notes during the trial.  Defendants were represented at trial by four attorneys.  Wade Dec., ¶2.  All four attorneys were present for each day of trial.  *Id*.  Defendants' counsel alternated conducting direct examination and cross examination. *Id*.  Thus, at all times there were a minimum of three attorneys who were able to take notes during the proceedings.  Wade Dec., ¶3. See *Natural Organics, Inc.* , 2009 WL 2424188, at *3-4(court determined that the expedited trial transcript was not necessary where prevailing party was represented by three attorneys); see also *Karmel v. City of New York*, 2008 WL 216929, at *3 (S.D.N.Y., 2008)(court determined that where at least two attorneys were present at trial representing defendants, sufficient notes could be taken to obviate the need for daily trial transcripts); see also *Bilezikjian v. Baxter Healthcare Corp.*, 1999 WL 945522, at *3 (S.D.N.Y., 1999)(court found daily trial transcript not necessary where prevailing party was represented by three attorneys at trial).

Moreover, the transcript of defendants' Rule 50 motion, the motion that defendants claim they used the trial transcript for, shows that defendants' counsel did not once make specific reference to the trial transcript in support of their Rule 50 motion.  September 26, 2011 Trial Transcript, pages 1011-1059 (Wade Dec., Exhibit A).  Defendants' counsel merely made reference to the trial testimony generally, without any citations to the transcript.  By way of example, defendants' counsel made the following reference to the trial testimony during defendants' Rule 50 motion:  "I mean, you know, the facts, it's come out from everybody, you

8

know, the two defendants, all six of the officers testified that Anthony Velez was released and he was injured when he was no longer in custody.  That's the same story you've heard from the family."  September 26, 2011 Trial Transcript, page 1015 (Wade Dec., Exhibit A).  The other five or so references to the trial testimony made by defendants' counsel during their Rule 50 motion were similar in nature to the foregoing reference in that they were very general recitations of witnesses' testimony regarding certain subject matters.  *Id*.  As the Court can see, the references that defendants' counsel made to the trial trial testimony during their Rule 50 motion were of the sort that could have easily been obtained from notes taken by any one (or more) of defendants' four attorneys during the trial.  Indeed, the general references to the trial testimony could have easily been made simply from memory of the trial proceedings, which at that point had only been five days long.

The length of the trial is another factor to be considered in determining defendants' entitlement to costs for the expedited trial transcript.  *See Bucalo*, 238 F.R.D. at 129.  Here, the trial lasted for a total of seven days, with witness testimony comprising only five of the seven days.  Wade Dec., ¶4.  The fact that the trial was only seven days and comprised of only five days of testimony is further reason why the trial transcript was not "necessary" under Rule 54.1.  See *Id*(court held that trial transcript was not necessarily obtained where the trial lasted for eleven days and testimony was only taken on eight days); see also *Dehoust v. Baxter Healthcare Corp.*, 1999 WL 280243 (S.D.N.Y. 1999)(court held that trial transcript was not necessary where the trial lasted less than two weeks).

Finally, the complexity of the claims must also be considered in determining whether defendants are entitled to costs for the trial transcript.  Although this case involved several state

and federal claims, some of which may be considered complex from a legal standpoint, there is no indication that defendants' counsel used the trial transcript in their Rule 50 motion to clarify or assist in demonstrating legal points with respect to those claims.  September 26, 2011 Trial Transcript, page 1015 (Wade Dec., Exhibit A).  Rather, defendants' counsel relied heavily on case law in their Rule 50 motion.  *Id*.  Obviously, the trial transcript was not necessary for defendants to present applicable case law in their Rule 50 motion.

### Point 2:  Defendants Are Not Entitled to Costs for Second Copies of the Deposition Transcripts

Defendants seek costs for the original, plus two copies of the deposition transcripts of witnesses Towanda Velez, Yolanda Young, and Cynthia Lindsey.  Local Civil Rule 54.1, however, provides for costs, where appropriate, for only the original deposition transcript, plus one copy.  Defendants, therefore, should not be awarded costs for obtaining second copies of the deposition transcripts of witnesses Towanda Velez, Yolanda Young, and Cynthia Lindsey.  See *Karmel v. City of New York*, 2008 WL 216929, at *4 (S.D.N.Y. 2008)(court reduced by one-third the cost of deposition transcripts where two copies were made); see also *Carmody v. City of New York*, 2008 WL 3925196, at *2 (S.D.N.Y. 2008).

### Point 3:  Defendants Are Not Entitled to Costs for Court Reporter "Appearance Fee"

Defendants include in their Bill of Costs court reporter "appearance fees" that were incurred in connection with the depositions of witnesses Towanda Velez, Yolanda Young, and

10

Cynthia Lindsey.  Savino Dec., Exhibits 1-3.  Local Civil Rule 54.1, however, limits recovery for the cost of depositions to "the original transcript of the deposition, plus one copy." *Williams v. Cablevision Systems Corp.*, 2000 WL 620215, at *2, (S.D.N.Y. 2000).  "Even where the cost of a deposition transcript itself will be taxable under these standards, certain associated fees that are not necessary generally may not be taxed- for example,....appearance fees..." *Farberware Licensing Co. LLC v. Meyer Marketing Co.*, Ltd., 2009 WL 5173787, at *5 (S.D.N.Y. 2009); see also *Sim v. New York Mailers' Union Number 6*, 1999 WL 674447, at *2 (S.D.N.Y. 1999).  Defendants' application for recovery of "appearance fees" costs should, therefore, be denied.

## Conclusion

For the reasons stated above, defendants' application for costs should be denied and any award of costs granted to defendants should be reduced accordingly.

Dated: New York, New York
           November 21, 2011


MICHAEL G. O'NEILL


_____
By:  Theresa B. Wade (TW0522)
Attorneys for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Towanda Velez, as personal representative of the estate
of Anthony Velez, deceased,

                    Plaintiff,

                 - against -

City of New York, Rudolph Hall, Michael Ruggiero,
and J. Does 1-8,

                  Defendants.

04 CV 1775 (ENV)(MDG)

Declaration of Theresa B. Wade

        Theresa B. Wade, declares under penalties of perjury as follows:

        1.      Annexed hereto as Exhibit A is a copy of the relevant portions (pages 1011-1059) of the fifth day of trial, held September 26, 2011.

        2.      Defendants were represented at trial by four attorneys.  All four attorneys were present for each day of trial, and defendants' counsel alternated conducting direct examination and cross examination.

        3.      Thus, at all times there were a minimum of three attorneys who were able to take notes during the proceedings.

        4.      Trial in this matter lasted for a total of seven days, with witness testimony comprising only five of the seven days.

Dated: New York, New York
       November 21, 2011

                              MICHAEL G. O'NEILL

                              _____
                              By:  Theresa B. Wade (TW0522)
                              Attorneys for Plaintiff

30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990

# Exhibit A

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
   TOWANDA VELEZ, as Personal      :    04-CV-1775
3  representative of the estate
   of Anthony Velez, deceased,     :
4                                       United States Courthouse
                   Plaintiff,     :    225 Cadman Plaza East
5                                       Brooklyn, N.Y.  11201
               versus             :
6
   CITY OF NEW YORK, RUDOLPH HALL,:    September 26, 2011
7  MICHAEL RUGGIERO, and               10:00 a.m.
   John Does 1-8,                 :
8                  Defendants.
   ------------------------------x
9

10                  TRANSCRIPT OF TRIAL
             BEFORE THE HON. ERIC N. VITALIANO
11       UNITED STATES DISTRICT COURT JUDGE, and a jury.

12

   APPEARANCES
13
   For the Plaintiff:          MICHAEL G. O'NEILL
14                             THERESA BUI WADE
                               Law Office of Michael G. O'Neill
15                             30 Vesey Street - Suite 301
                               New York, New York  10007
16

17 For the Defendant:          MORGAN DAVID KUNZ
                               KIMBERLY MARIE SAVINO
18                             MARY O'FLYNN
                               WESLEY BAUMAN
19                             New York City Law Department
                               100 Church Street
20                             New York, New York  10007

21

   Court Reporter:             Charleane M. Heading
22                             225 Cadman Plaza East Rm N357
                               Brooklyn, New York  11201
23                             Tel: (718) 613-2643

24 Proceedings recorded by mechanical stenography, transcription
   by computer-aided transcription.
25

Proceedings

1            THE COURT:  Agreed?

2            MR. KUNZ:  Agreed.

3            THE COURT:  See you at 3:45.

4            (Recess taken.)

5            (In open court; outside the presence of the jury.)

6            THE CLERK:  Court is back in session.

7            THE COURT:  Okay.  So we can set, set the scene, we

8    are now at the close of the plaintiff's case for purposes of,

9    of where we are.

10           We haven't heard the defendants' case yet.

11           Go ahead.  Motions?

12           MR. KUNZ:  Well, just to start out, your Honor, we

13   just wanted to make it official because Rule 50 is rather

14   specific in its requirements, but plaintiff's case, having

15   been fully heard, we do believe that a reasonable jury would

16   not have a legally sufficient evidentiary basis to find for

17   the plaintiff on, and we intend to move on all claims and

18   we're going to go through one by one and present the legal and

19   factual basis for those arguments.

20           THE COURT:  Yes.  And the way we'll, we'll do that,

21   Mike, we'll have you respond after Marty finishes on each

22   claim.

23           MR. O'NEILL:  That's fine.

24           THE COURT:  Just so we can get it, you know, and you

25   can be seated if it's easier for you.

Proceedings

1              Who's going to go first?

2              MS. SAVINO:  I'm going to take the first one, your

3      Honor.

4              THE COURT:  Okay.

5              MS. SAVINO:  Your Honor, at this point, the

6      defendants are going to renew the motion in limine point one.

7              Your Honor, at this time the defendants are going --

8              THE COURT:  You mean the argument that was made

9      there?

10             MS. SAVINO:  Yes, the argument that was made there.

11             THE COURT:  You're now making it in a Rule 50

12     context?

13             MS. SAVINO:  Yes, your Honor.

14             And the plaintiff, as I understand it, is making a

15     claim against the City under the theory that it failed to

16     adequately train and supervise its police officers --

17             THE COURT:  Is that -- refresh me.

18             I had assumed -- what cause of action, is that all

19     part of the first cause of action?

20             MR. KUNZ:  Yes.

21             The first cause of action is listed on the joint

22     pretrial order and plaintiff's section is a Section 1983 claim

23     for failure to train.

24             THE COURT:  Okay.

25             MR. KUNZ:  And that's also what's made out in the

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

1013

Proceedings

```
 1    averments in the complaint.

 2              THE COURT:  And that's not part of the -- is there a

 3    separate state claim for that?

 4              MR. O'NEILL:  Yes, your Honor.

 5              MR. KUNZ:  Yes.  Plaintiff does purport to make a

 6    separate state law claim.

 7              THE COURT:  For training.

 8              Okay.  And, but these are, these are all, in the

 9    1983 claim, are these separate standing or are they all

10    together items that point to the alleged reckless,

11    recklessness of the defendant, Defendants Hall -- This is

12    against Defendants Hall and --

13              MR. KUNZ:  Well, the failure to train --

14              THE COURT:  -- and Ruggiero?

15              MR. KUNZ:  -- claim against the City of New York is,

16    in some ways, incumbent upon a finding of liability against

17    the individual defendants.

18              THE COURT:  Right.

19              MR. KUNZ:  But if --

20              THE COURT:  This is the *Monell* claim?

21              MR. KUNZ:  Yes.

22              THE COURT:  That's the first claim, is the *Monell*

23    claim?

24              MR. KUNZ:  The first claim that's listed on the

25    joint pretrial order by plaintiffs, yes.
```

Proceedings

1            THE COURT:  I think it makes for sense to take --

2    let's take the claim against Hall and Ruggiero first.

3            MR. KUNZ:  Okay.  So the Section 1983 claim against

4    Hall and Ruggiero is based on the --

5            THE COURT:  It's -- obviously, if I were to grant

6    that, right, the *Monell* claim would go bye-bye?

7            MR. KUNZ:  That's true, your Honor, yes.

8            Except if you granted on qualified immunity grounds,

9    there's some --

10           THE COURT:  Right.  Exactly, yes, yes, yes.

11           MR. KUNZ:  So the substantive due process claim is

12   under the 14th Amendment.

13           You know, before we begin, we note that, you know,

14   under Second Circuit Supreme Court precedent, this is a very

15   difficult claim to make out.  It's only for exceptional

16   circumstances and we do not believe this case presents such

17   exceptional circumstances.  So the two subspecies of the

18   Fourteenth Amendment claim is the state-created danger and the

19   special relationship exceptions.

20           *Pena* versus the City, sorry, versus *Deprisco*, 432

21   F3d 98, makes very clear that these are separate and distinct

22   theories of liability.  They're separate claims.

23           Some other circuits have sort of mixed them together

24   and do a hybrid.  The Second Circuit does not do that.  They

25   are separate claims.

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1           The special relationship claim typically arises in,

2     in situations of involuntary custody.  So where an individual

3     is detained, say, in a correctional facility, you might have a

4     special relationship, or in the case of a foster child, you

5     may have a special relationship requiring the state actors to

6     take some action to protect that individual from harm by third

7     parties.

8           In this case, there's simply no evidence whatsoever

9     of a special relationship.  The, as *Matican*, as *Ying Jing Gan*

10    and as *DeShaney* all make it clear, involuntary restraint is a

11    necessary prerequisite for a special relationship.

12          So the analogy in this case is had we taken Anthony

13    Velez into custody and he was at the police precinct when

14    Michael Smith hurt him, then, yes, there may be a special

15    relationship.  But in a situation where we did not take him

16    into custody and he was free to fend for himself as the case

17    law says, there's just simply no basis to support a special

18    relationship claim.

19          THE COURT:  Okay.

20          MR. KUNZ:  And we can cite to the record here.  I

21    mean, you know, the facts, it's come out from everybody, you

22    know, the two defendants, all six of the officers testified

23    that Anthony Velez was released and he was injured when he was

24    no longer in custody.

25          That's the same story you've heard from the family.

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings                        1016

1   Those are the facts.  Plaintiff was not in custody when he was

2   injured.

3            THE COURT:  Anything further on the --

4            MR. KUNZ:  Well, that's just the special

5   relationship.  I could let Mr. O'Neill respond to that before

6   we go into the state-created danger.

7            MR. O'NEILL:  Well, he was in custody, your Honor.

8            He was in custody when he was held outside in the

9   hall and it was his release that created the danger that

10  caused him to be killed.

11           So the --

12           THE COURT:  Factually, though, you don't contest

13  that at the moment the shots were fired, he was not in

14  custody?

15           MR. O'NEILL:  I do not contest that fact.

16           THE COURT:  I think that's the point that Mr. Kunz

17  is making, correct?

18           MR. KUNZ:  Yes.

19           MR. O'NEILL:  Well, that, yes, but that's, that's

20  the only view of the evidence.

21           However, I --

22           THE COURT:  Right.  After a week here, I agree.

23           MR. KUNZ:  We can agree on something.

24           Okay.  We're getting there.

25           MR. O'NEILL:  But I don't, I don't agree with the

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1   consequences, the legal consequences of that fact.  I mean, he

2   had been in custody, and at that point, because of the fact

3   that they put him in custody in these circumstances, they,

4   they, a duty arose not to take any action that's going to

5   cause him harm.

6          The whole point of the special relationship or

7   state-created danger --

8          THE COURT:  He's doing one at a time.

9          MR. O'NEILL:  Right, I mean, but the underlying

10  reason for these isn't -- there is no white line rule under

11  the case law that a person must be in protective custody.  The

12  rule is that there must be a special relationship which

13  frequently the fact pattern that gives rise to this is that

14  the person's in custody.

15         The, the reason that you -- the role that special

16  relationship plays is to give rise to a duty.  That's, that's

17  the whole point of this.

18         And I just think that under the circumstances of

19  this case, which isn't a very unusual case, to say the least,

20  that the fact that they had him in custody and under the

21  circumstances by which they had him in custody, under the

22  foreseeability that releasing him is going to cause him some

23  harm, that that's sufficient to give rise to the duty and that

24  that, that, at the time that they had him in custody, there

25  was a special relationship and the duty arose at that point.

1018

Proceedings

1    So that's our argument on special relationship.

2    THE COURT:  Okay.  Let's go to the next one.

3    MR. KUNZ:  Okay.  So the state-created danger, as we

4    laid out on page 11 of our motions in limine, we believe would

5    be the more applicable of the two, the two exceptions to the

6    general rule that the Fourteenth Amendment does not require

7    the police to protect people from harm by third parties.

8    We believe that that, if a claim does go to the

9    jury, it should be under the state-created danger, and I think

10   that even this claim, the argument is pretty weak.

11   The chief, the chief case in point in this circuit

12   is *Dwares*, D-W-A-R-E-S, it is 985 F2d.  I've got a pen cite

13   here to 98, but the original site is 985 F2d 94, Second

14   Circuit, 1993.

15   In that case, some skinheads, sorry, some protesters

16   were burning flags in Washington Square Park and some

17   skinheads were counter-protesting, and they went up, the

18   skinheads went up to the police officers and said we're going

19   to beat the crap out of a couple of these flag burners over

20   here and the cops said something to the effect of, go ahead,

21   just don't get too out of control.  Just don't get too bad and

22   we won't stop you.

23   And the Second Circuit held that that action could

24   give rise to a Fourteenth Amendment claim that we deprived

25   these individuals of their life and liberty because the

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1    officers "assisted in creating or increasing the danger to the

2    victims."

3              The affirmative statements on the part of the police

4    officers that, that these individuals would be allowed to

5    assault the flag burners created this active participation,

6    almost a conspiracy between the state actors and the private

7    actors to deprive these third parties of their rights.

8              Now, I think that that is a, there's a very

9    different situation going on in this case.

10             The allegation from plaintiff is not that the

11   officers assisted in creating this danger.  He essentially

12   says that they were negligent, that they were reckless, that

13   their conduct, you know, somehow failed to, to match with what

14   he believes the purported correct action should have been.

15   But that is, that is not something that the case law

16   recognizes as a valid claim.

17             Plaintiff needs to show that the police officers

18   assisted in or increased the danger of, so the analogous

19   situation here would be is if the police officers said to the

20   people in the apartment, he's the confidential informant, you

21   can beat him up.  We won't, you know, we won't stop you if

22   it's not that bad, and then they, you know, went along their

23   merry way.

24             Again, there's, when you look at the facts of this

25   case, at worst, plaintiff is alleging that the officers made

Proceedings

 1    the wrong choice.  Essentially he says that when they, before

 2    they left, they should have reached out and they should have

 3    called Anthony Velez and told him to stay clear.  Right?

 4    That's not a reckless act.  That's, it's a failure, it's a

 5    negligence, that sort of argument.

 6            They say that the police made the wrong decision at

 7    the scene when they encountered Anthony Velez there.  They

 8    should have arrested him instead of stopped questioning,

 9    frisking him.

10            Again, I mean, this is a judgment call.  This is a

11    discretionary call.  This is not something that is an active

12    participation on the part of the police officers in creating a

13    danger to Anthony Velez.

14            So we frankly think that plaintiff does not make out

15    the state-created danger argument.

16            THE COURT:  Mr. O'Neill?

17            MR. O'NEILL:  Your Honor, the defendants here are

18    conflating the danger that's created with the injuries that

19    are suffered.

20            The Second Circuit in *Matican versus the City of New*

21    *York* held that when the police take action, when they plan an

22    operation based on information provided by a confidential

23    informant, that that is the state-created danger.  It's

24    exactly what happened here.  The police took action based on

25    information provided by Anthony Velez, who was a confidential

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

1021

Proceedings

1   informant.

2         So the danger that was created is the state, is the

3   action that was taken.  You know, you want to call it a raid,

4   a search, whatever you call what they did in apartment 5C,

5   that's what created the danger, because if the police hadn't

6   come to the apartment, Mr. Velez would never have been

7   identified as an informant.

8         So it was them coming there and taking police action

9   in his presence.  That's the state-created danger.

10         Now, the *Matican* holding is right on point, they

11   said, yes, this is a state-created danger, and they found for

12   the defendant on other grounds, but by planning and carrying

13   out this operation, they created the danger that his identity

14   would be given up, which of course is what happened and he got

15   killed.

16         So we're squarely within state-created danger.  I

17   don't know if that's even a close call, but I think you can

18   give us Rule 50 judgment on that particular issue.

19         MR. KUNZ:  I think, I'm not sure what part of

20   *Matican* plaintiff is talking about, but I don't think that is

21   at all the fact pattern or the holding of *Matican*.

22         Matican was a former confidential informant who,

23   who, not even a confidential informant, I think he did a

24   direct eyewitness seen, eyewitness identification, and then

25   the person was arrested based on that identification and was

Proceedings                                        1022

1  later released and the police never warned Matican that this

2  guy had been released.

3           MS. SAVINO:  I believe the police actually made

4  promises to him that he would not be released given the amount

5  of weight of the drugs that had been recovered, so on that

6  reliance, that individual did not believe this person would be

7  getting out and then this person is released and a few, a

8  period of time later comes and slashes --

9           MR. KUNZ:  Three months later, I believe, in

10  *Matican*.

11           So, again, that's just -- *Matican* is not, does not

12  hold what the plaintiff just said it held and, you know, quite

13  frankly, you know, when you think about the state-created

14  danger case law, when you think about what it's trying to get

15  at, it's trying to get, it's trying to create a cause of

16  action for individuals who are hurt by affirmative actions of

17  the police.

18           When the police somehow increase or create the

19  danger to the individual through their actions, that's when

20  the state-created danger theory can apply and that's not what

21  happens here.  Plaintiff is essentially saying an act or

22  omission of some kind is what led to this chain of events.

23           THE COURT:  I know omission is a kind of action,

24  right?

25           MR. KUNZ:  Well, it's a failure to take action.

Proceedings

1           And, again, you know, the state-created danger is

2    it's, it's, you know, I think it's *Pena* using this language of

3    active versus passive as making a distinction here between the

4    different types of conduct.

5           And to rise to the level of a substantive due

6    process claim, the police have to have basically become part

7    of the testimony.  And, you know, when you look at the

8    complaint and the testimony in this case, it shows that the

9    plaintiff, sorry, that Anthony Velez himself went up to the

10   apartment that night.

11          Now, I know there's been some speculation based on

12   what Cynthia Lindsey says, that the police somehow brought

13   Anthony Velez to the apartment, but I think we can all agree

14   that that simply did not play itself out with testimony.

15          Cynthia Lindsey, in fact, was in the same room with

16   Sergeants Ruggiero and Hall, and she did not identify them as

17   the, as the officers that she saw talking with Anthony Velez

18   outside the apartment an hour and a half before the incident.

19          So if that happened, or who they were, you know, it

20   was not answered, but what we do know is that for some reason,

21   Anthony Velez himself made the choice to go up to that

22   apartment that night.  He placed himself there.  And then the

23   officers dealt with that situation.  They made a discretionary

24   call.  They thought the best decision to protect him was to

25   treat him like any other person who stopped, question and

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings
                                                                    1024

1   frisk, which is to let him go, and, you know, the rest of the

2   incident played out from there but, you know, and there's

3   other choices that Anthony Velez made that, that bear on this

4   situation.

5           It was Anthony Velez who decided after he got home

6   safely and he was comfortably at home, you heard Yolanda Young

7   testify that he did not seem scared, that he did not ask for

8   protection.

9           Anthony Velez decided to go back out onto the street

10  that night --

11          THE COURT:  Well, as an aside, based on the requests

12  that I've seen, there's no, there's been no suggestion that,

13  that negligence on the part of the plaintiff's decedent had

14  anything to do with his demise, is that correct?

15          MR. KUNZ:  Well, no.

16          Yes, we do have, we do have some special

17  interrogatories in on that, and, frankly, you know --

18          THE COURT:  You do?  Where?

19          MR. KUNZ:  We submitted special interrogatories on

20  Friday.

21          MS. SAVINO:  I e-mailed them to Mr. Snell and

22  uploaded them on ECF.

23          MR. KUNZ:  And we filed them on the -- yes, I think

24  the --

25          THE COURT:  Well, did you request any charges with

Proceedings

1    respect to those interrogatories?

2         MR. KUNZ:  Do we have charges on whether -- I mean,

3    I think this would deal with the state law claims.  The

4    contributory negligence, I don't think, would come into play

5    for the federal.

6         THE COURT:  That's why I said as an aside, with

7    respect to any claim?

8         MR. KUNZ:  Yes.  But, you know --

9         THE COURT:  Did you request a comparative, because

10   we're not talking about charge, now, we're talking just popped

11   into my mind when you mentioned that.

12        I don't recall seeing any requests with respect to a

13   charge in that area on the state law claim or any claim,

14   unless I missed it.

15        MR. KUNZ:  I'm not sure if we did put that in there,

16   your Honor.  But we could obviously submit some expeditiously.

17        THE COURT:  Everything will be expeditious.

18        MR. KUNZ:  At this point, yes.

19        THE COURT:  They're all post-haste at this point.

20        MR. KUNZ:  No, but I think the, I think the point

21   that we're trying to get at, your Honor, is that --

22        THE COURT:  But I understand your point on this.

23        Let me just ask you with respect to the 1983 against

24   Hall and Ruggiero, is there anything else that you're --

25        MR. KUNZ:  Yes, there's one overarching issue and

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1    that regardless of which or both claims go to the jury, the

2    second, the Second Circuit of the Supreme Court, everyone is

3    very clear that the officers' actions have to shock the

4    conscience and this comes from *Tomme v. Sacramento* which is

5    the Supreme Court --

6            THE COURT:  And your argument is there's nothing

7    here at the Rule 50 stage that should go to the jury because

8    of the absence of a shock to the conscience?

9            MR. KUNZ:  Right.  When you look at the actual

10   specific things our officers are accused of doing -- and it's

11   important to say for shock the conscience, that shock the

12   conscience goes beyond recklessness, it goes beyond

13   negligence.  It has to be intentional conduct that shocks the

14   conscience.

15           And when you look at the specific acts that these

16   defendants are accused of doing, failure to notify Anthony

17   Velez, failure to arrest Anthony Velez, those actions do not

18   shock the conscience.  And we don't think --

19           THE COURT:  Well, Mr. O'Neill's conscience.

20           MR. O'NEILL:  I think it would shock any citizen's

21   conscience to take actions of this nature that leads to

22   somebody's death.

23           MR. KUNZ:  Well --

24           THE COURT:  I don't want you to -- I understand your

25   argument there.

1027

Proceedings

1   Anything beyond that?

2   MR. KUNZ:  Well, no.  I think this is an important

3   distinction here because -- and Mr. O'Neill accused us of

4   conflating the issues, but quite frankly, it's the other way

5   around, that obviously the untimely death of Anthony Velez,

6   you know, is shocking.  No one wanted him to die, but our

7   officers, that's not what our officers did.  The officers did

8   not kill him.

9   You have to look at the actions --

10  THE COURT:  All I want at this point is, is I think

11  we all agree that that is an element.  Your argument, in sum

12  and substance, is that there, that the proof is so

13  overwhelming on that issue that there is nothing that I should

14  direct a verdict on.

15  MR. KUNZ:  Yes, that's exactly, your Honor.  That

16  plaintiff has not carried his case --

17  THE COURT:  Right.  I got it.

18  MR. KUNZ:  -- in showing that --

19  THE COURT:  Let's see what Mr. O'Neill says in

20  response.

21  MR. O'NEILL:  Mr. O'Neill disagrees.

22  THE COURT:  I hope.  Otherwise, this will be a very

23  short afternoon, Mr. O'Neill.

24  I expect you to just sort of just flesh out at this

25  stage what, why your disagreement is based on the record.

Proceedings

1          MR. O'NEILL:  This is on the, shocks the conscience.

2          THE COURT:  Yes, and the other point as well.

3          MR. O'NEILL:  Well, I mean, the other point on the

4    state-created danger, you know, there are all sorts of things

5    said.

6          I, and --

7          THE COURT:  Let me see if I understand your argument

8    and maybe we can cut, I don't want you to repeat things that I

9    think I understand you making.

10         That in, essentially is that you believe that the

11   police officers, Hall and Ruggiero, made a decision when they

12   were out in front of apartment 5C not to take certain action

13   and as a result of that distinction the danger to Anthony

14   Velez was increased.

15         MR. O'NEILL:  That is, that is correct.

16         There would be a bunch of other things, but we do

17   understand that.

18         THE COURT:  And that that was under the

19   circumstances such a shocking act, decision on their part, the

20   decision not to take action raises itself to the level of

21   shocking to the conscience.

22         MR. O'NEILL:  Yes.

23         THE COURT:  All right.  I, here's where I am on, on

24   that claim, because I assume the City has no further argument

25   on that.

Proceedings                    1029

1          MR. KUNZ:  Well, we, yes, I think we have, we have a

2    lot more to say and it's laid in our limine points on this,

3    but the last thing that I would point out is that *Pena*, the

4    Second Circuit case that's sort of put all this down, came

5    down in 2005.

6          THE COURT:  Okay.

7          MR. KUNZ:  *Okin*, *Hemphill*, a lot of these other

8    decisions that flush this out have come down after the

9    incident so, and *Matican* is another example.

10         So at the very least we believe there's a qualified

11   immunity argument here because it was not clear.

12         (Continued on next page.)

Proceedings

```
 1          THE COURT:  Here's -- this is my preliminary -- my

 2   preliminary thinking on qualified immunity.  And we'll talk

 3   about this more at the charge conference.  My preliminary

 4   thinking here is to -- is to charge on a bifurcated basis so

 5   that on the -- I would submit the case to the jury without

 6   reference to qualified immunity on this claim.  If in fact the

 7   jury were to return a verdict for the Plaintiff on this claim,

 8   then I would submit the qualified -- I would --

 9          MR. KUNZ:  Submit the special.

10          THE COURT:  And submit a special further instruction

11   and a special interrogatory with respect to qualified

12   immunity.

13          MR. KUNZ:  Yeah, I think that's what we would

14   prefer.

15          THE COURT:  Overall, with respect to this claim, I

16   am going to reserve on the motion.  I'm going to let it go to

17   the jury and we'll see what happens.  Though I will say to

18   you, Mr. O'Neill, that the ice here is thin.

19          MR. O'NEILL:  Yes, it's a difficult case.

20          THE COURT:  I think Mr. Kunz is correct in his

21   commentary that this is meant to be a difficult case to win

22   from the legal on what the -- what the standard is.  And I'm

23   inclined, because I always err -- when it's close I always err

24   to send the claim in because I can always take care of it

25   later if I'm ultimately convinced.
```

1031

Proceedings

```
1              I'm assuming that the jury were to return a verdict

2    for the Plaintiff, on a posttrial motion I'd have to deal with

3    it as to whether or not there should be a JNOV or whether or

4    not there should be a -- set aside the verdict and a retrial

5    summary.  But on that -- on that claim I'm going to reserve.

6              MR. KUNZ:  The state-created danger, you mean,

7    or the --

8              THE COURT:  On both.

9              MR. KUNZ:  Okay.

10             THE COURT:  My intention is to send both in as

11   alternatives and they can -- it will be an either or, or they

12   may find it both.  They could theoretically find both.  But

13   they could, obviously, theoretically reject both or they can

14   find all of those things and get to that fifth step I think it

15   is.

16             MR. KUNZ:  Shocks the conscious.

17             THE COURT:  Shock the conscious, and find that it

18   doesn't.  The problem ultimately for the Plaintiff, frankly

19   speaking here, is that she's going to have to get a series of

20   yes answers and any no, then it's almost like -- it's like a

21   criminal case, if you've got five elements to prove and you

22   prove four but you don't the prove the fifth, you get nothing.

23   So it's equivalent.

24             So it's similar here on this claim, they have to

25   prove each element.  If they fail to prove any one, it would
```

Proceedings

1    be a judgment for the defendant on that.  But separately

2    stated, it's the --

3            But again, a preview.  There are two separate

4    defendants, they are entitled to two separate

5    interrogatories -- set of interrogatories on those issues.

6    You may find one way as to one defendant, another way as to

7    another.

8            Okay, move on to the -- to the next claim which I

9    guess was the first claim, which was the Monell claim.

10           MS. SAVINO:  Yes, your Honor, as to Plaintiff's

11   claim against the City of New York for Monell liability for

12   failure to train --

13           THE COURT:  And I think Mike, you also refer to this

14   sometimes as the Walker claim.

15           MR. O'NEILL:  That's right, Judge.

16           THE COURT:  Yeah.  So the record will -- we're going

17   backwards on the record.  References to Walker are referring

18   to this claim as well.

19           Go ahead, Ms. Savino.

20           MS. SAVINO:  Your Honor, in regards to this claim, I

21   think the first thing that needs to be addressed is the fact

22   that the Second Circuit of the Supreme Court has found that

23   there needs to be a pattern of violations that a single

24   incident is not sufficient.  The Second Circuit said on -- I

25   don't know how to pronounce it.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1          THE COURT:  It begins with an R.

2          MS. SAVINO:  Ricciuti versus New York City Transit

3     Authority, 941 F.2d 119, as well as the recent case of Connick

4     v. Thompson that there needs to be a pattern of violations.

5          We've heard all the testimony and the evidence.

6     There has been no evidence that there have been a pattern of

7     violations of similar situations that would put policy makers

8     on notice that their procedures were deficient.

9          To establish this claim, Plaintiff has to establish

10    that the failure to train amounts to deliberate indifference

11    to the rights of those to whom municipal employees will come

12    into contact.  There has been simply no evidence of that to

13    establish that he needs to satisfy a three-prong test, first

14    that the policy maker knows to a moral certainty that her

15    employees will confront different situations.  Again, there

16    has been no evidence that the policy makers would have been

17    put on notice as this is a single solitary incident, a very

18    unique incident.

19         Second, the Plaintiff must demonstrate that the

20    situation either presents the employee with a difficult choice

21    of this sort, that training or supervision will make it less

22    difficult or that there is a history of employees mishandling

23    the situation.  Again, there has been no testimony in the

24    record where Plaintiff would be able to establish this -- the

25    second prong.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1    And third, that Plaintiff must demonstrate that the

2    wrong choice by the City employee will frequently cause the

3    deprivation of a citizen's constitutional rights.  Again,

4    there has been no evidence to support that claim.

5    And we heard from Plaintiffs expert, Mr. Pollini,

6    who first of all said he wasn't familiar with the policies and

7    procedures I believe at the time in regards to confidential

8    informants since he had already left the force.  But he didn't

9    seem to -- to me, as I understood his testimony, to have any

10   issue with the city's policies and practices.  His issue was

11   with what these officers did wrong.

12   Secondly, Mr. Pollini testified that his experience

13   and his basis to be an expert was based upon his on-the-job

14   experience of 33 years, which is the same experience that we

15   are contesting our officers possessed was their on-the-job

16   training.  And I believe even Mr. Pollini and

17   Sergeant Ruggiero have the same degrees, master's in police

18   science, I believe it was.

19   So Mr. Pollini isn't saying that the policy and

20   practices were deficient, this is a one note incident that

21   would not have put policy makers on notice that something

22   similar would happen where they would need to change their

23   policies and practices.  And the training experience of our

24   officers and their on-the-job experience, they may not have

25   had formal classroom training but this isn't the kind of thing

Proceedings

1     that can be taught out of a textbook.  So their on-the-job

2     experience is the same as what Mr. Pollini had I believe is

3     sufficient to negate any Monell, municipal liability claim

4     that the plaintiff has brought against the City.

5              THE COURT:  Mr. O'Neill.

6              MR. O'NEILL:  Yes, just very briefly, your Honor.

7     Just in terms of the elements, the city's witness, Detective

8     Curry, testified that the City has an institution, was aware

9     of the dangers that are posed to confidential informants.

10    That's all I need to show.  I don't have to show a particular

11    policy maker by name.  The City is an institution, so

12    that's -- that's the city's admission, so to speak, as to the

13    first element.

14             As to the second, that that -- I think on the

15    second, the second element that the City says you have to show

16    some sort of repetition or --

17             THE COURT:  Pattern.

18             MR. O'NEILL:  Pattern.  But that's not what -- what

19    the Canton -- not the Canton, Connick case said.  The Connick

20    said that's one way of meeting that element.  However, there

21    are some situations where the danger is so obvious that you

22    don't need to have a pattern of violations to put the

23    Municipality on notice.

24             Again, we had the Municipality here admitting that

25    it was aware that when a confidential informant's identity is

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1  breached, that the informant is in mortal danger.  I don't

2  need to show that 20 confidential informants have been killed

3  because their identities have been given up through the -- the

4  misconduct or the malfeasance or negligence of the city's

5  officers.

6          So there is no requirement that there be a pattern

7  of violations.  That's one way of showing that the

8  Municipality knew or should have known, but that's not the

9  only way.  The Supreme Court in Connick said sometimes the

10  danger is so obvious that you don't -- you don't need to show

11  that, just the nature of the danger.  I think that's what we

12  have here.  The City admitted.  Mr. Curry was very, very clear

13  on this, if the criminal is capable of committing murder, then

14  the informant's life is in danger if his identity is given up.

15          Now, in terms of the training itself, I believe the

16  testimony was there was no training, period.  They just didn't

17  receive any training.  Now, the defendants tried to backtrack

18  on that by saying they had some what they call informal

19  training.  But the jury doesn't have to have to believe that,

20  the jury doesn't have to accept that.  Because they both

21  testified at their depositions that they received no training.

22          Officer Hall today, the jury heard his statement,

23  that he received no instructions from anyone, is what he said

24  at his GO-50 hearing.  That would of course permit the jury,

25  again, to disbelieve any testimony about on-the-job training

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1    or formal training.

2         So, you know, I'm not sure I understand exactly what

3    the City's argument is here.  The evidence is certainly

4    sufficient for the jury to determine the City knew the risk,

5    they knew that if they didn't give proper training that an

6    informant's identity could be given up and that if that

7    happened, then somebody could die.  That's what the evidence

8    in this case shows.

9         I'm not sure I understand the argument about

10   Mr. Pollini himself having on-the-job training and the like.

11   He was my expert on police practices and procedures.  He was

12   really not being used by me as an expert on the training issue

13   that -- you know, that, there really isn't any dispute.  These

14   people didn't receive training.  They didn't know what to do.

15        THE COURT:  City want to be heard on rebuttal?

16        MR. O'NEILL:  Yes, your Honor, I think on a

17   multitude of issues.  But first of all, I think Plaintiff's

18   counsel is making a big leap that just because Detective curry

19   said it's common knowledge that there are dangers to

20   confidential informants does not mean that the Municipality

21   was on notice of this particular incident, what would have

22   happened in this particular situation.  I think that's a big

23   leap that Plaintiff's counsel is trying to make.

24        Additionally, as to the training portion, I don't

25   believe that we are in agreement at all as to the lack of

Proceedings

1  training on behalf of the officers.  Just because they didn't

2  have formal classroom training, all six of them testified that

3  they had on-the-job training.

4       Mr. Pollini, who Plaintiff's counsel called as an

5  expert perhaps in police practices, but he testified as to his

6  experience.  He testified that he received his experience from

7  on-the-job training.  Again, this is not something that can be

8  taught in a textbook.  So I think that Plaintiff's counsel is

9  missing the point.

10      This was one incident.  Just because he's claiming

11 and Detective Curry said that, you know, there are dangers

12 posed to confidential informants and did not put the

13 Municipality and the policy makers on notice, there's been no

14 testimony that their policies and procedures are deficient.

15 There has been no testimony in that regard.  Plaintiff's

16 expert didn't testify that there was anything deficient in the

17 policies and practices.  I just don't believe that the leaps

18 that plaintiff's counsel is making in connecting of the dots,

19 establishes a Monell claim.

20      THE COURT:  Okay.  I don't -- I frankly don't think

21 this one is even close.  Everyone agrees, and whether they

22 want to say they agree now or not really doesn't matter much,

23 it's been said several times at various times during the trial

24 it's a relatively unique situation with this particular status

25 of this particular deactivated informally but not formally

Proceedings

1  deactivated confidential informant.

2          Particularly the testimony of Pollini is

3  overwhelming that the New York City -- in fact, what he bases

4  his opinion on as to -- as to what is the proper way that this

5  should have been handled is the parole guide, which he says is

6  available to all police officers passively, which is the

7  normal way that it's made available, and through on-the-job

8  experience.  So that is what effectively what Pollini has

9  recognized in his testimony as what the city of New York

10  should have done that would have avoided the kind of incident

11  that occurred here.  So on -- which certainly is not --

12  there's no particular -- there's no evidence whatsoever that

13  this particular fact pattern has ever appeared at any time in

14  the -- prior to 2004 or frankly subsequent to 2004.

15          So the motion that the City makes under Rule 50 for

16  a directed verdict on the Monell claim is granted.

17          Next claim.

18          MR. KUNZ:  The next is the state law negligence

19  claim, your Honor.  And our chief argument here is on the --

20          THE COURT:  There are a couple of these.  Which one

21  are we talking about?  Let's -- let's --

22          MR. KUNZ:  I have --

23          THE COURT:  Let's address first the -- if you will,

24  and I don't know if it's you or one of your colleagues,

25  however you whack this up.  There are a couple of almost

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

 1    freestanding claims against the City on negligence, one on

 2    negligent supervision and one on failure to train.  They're

 3    sort of freestanding, is that how you're viewing them?

 4              MR. KUNZ:  Yeah, I think that's right.

 5              THE COURT:  And you -- and you're moving to -- for a

 6    directed verdict on that?

 7              MR. KUNZ:  Yes, exactly.  So -- well, there's a lot

 8    of issues here and so we can take whichever one your Honor

 9    prefers.  But I was going to start with the negligence claim

10    against all of the defendants, not for failure to train but

11    for the specific conduct that they took in this case.

12              THE COURT:  Yeah, I think that -- let's -- let's --

13    so we're not -- where it's not confused on the record, let's

14    take what I have to call the two freestanding negligence

15    claims, state law claims for negligent training, negligent

16    supervision separately and take them first.

17              MR. KUNZ:  Well, I think our biggest point here is

18    that it's uncontested that these officers were --

19              THE COURT:  They were in the scope of their

20    employment.

21              MR. KUNZ:  Right, exactly.  And so essentially that

22    Plaintiff can't have it both ways.  He can't claim in the

23    negligent training and supervision state law negligence claim

24    that the officers were not acting within the scope of their

25    employment and then for the federal claims argue that they

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings                                    1041

1   were acting within the scope of their employment.

2            THE COURT:  Well, there's no -- I mean, isn't the

3   proof overwhelming here that they -- I'll hear you,

4   Mr. O'Neill, if you think otherwise, that they were acting

5   within the scope of their --

6            MR. O'NEILL:  Absolutely.

7            MR. KUNZ:  Yeah.  Yeah, and we contest that point.

8   So --

9            THE COURT:  But you contest --

10           MR. KUNZ:  We don't contest.  I'm sorry, your Honor.

11  We agree, the officers were acting within the scope of their

12  employment.

13           THE COURT:  And as I understand -- and Mr. O'Neill,

14  if you have case law to the contrary, let me know.  But as I

15  understand it, if that is the case under New York Law, then

16  the -- then those claims that you're restricted at that point

17  to some claim of negligence against the employee and

18  respondeat superior against the employer.

19           MR. O'NEILL:  No, I disagree with that, Judge.

20           THE COURT:  All right.

21           MR. O'NEILL:  And I do have case law.  The reason I

22  believe that there's a little confusion about this is because

23  these terms negligent training and negligent supervision and

24  negligent hiring and negligent retention are sometimes all

25  said in the same breath as if they were all the same thing

1042

Proceedings

1    claim.  They are not.

2                  Negligent retention, negligent -- even negligent

3    supervision.

4                  THE COURT:  Well, there's no negligent retention.

5                  MR. O'NEILL:  No, we're not making a negligent

6    retention.  Those torts are available when the employee is

7    acting outside the scope of employment.  Negligent training

8    has been held to be a claim that can be made or asserted

9    against the Municipality in state court for injuries that are

10   sustained due to the negligent training and supervision of a

11   law enforcement officer.

12                 And the court of appeals decision on that is Barr v.

13   Albany County, which is at 50 NY2d 247.  And that cite -- that

14   itself cites back to an earlier second department case,

15   Meistinsky, M-e-i-s-t-i-n-s-k-y, v. City of New York, 285 A.D.

16   1153.  I have seen this recognized in federal court as late as

17   Spillman v. City of Yonkers.  I have 2010 Westlaw 86139.

18   86139, that's right.  Which is a 2010 Southern District case.

19                 So I -- none of these cases say that the officer has

20   to be acting outside the scope of employment.  In fact, if you

21   read the fact patterns, it's often very clear that the

22   officers weren't acting within their scope, executing the

23   search warrant in one of the cases.  I think that's the Barr

24   case.  So, that -- we think that's a viable claim.

25                 THE COURT:  Have you looked at these cases?

Proceedings

1              MR. KUNZ:  Well, I don't know that we've read the

2       specific cases.  That's the first time we're hearing of them.

3       But, you know, I think that the case law is clear and that the

4       state courts and the federal courts have all opined that they

5       don't want this negligent training claim to essentially become

6       respondeat superior.  They are separate and distinct

7       theories/and, you know, sort of another overlay here is

8       that --

9              THE COURT:  Well, the issue -- whether they're

10      separate and distinct theories is irrelevant.  The issue is,

11      is it a separate distinct and alternative theory where you

12      have to pick one or the other.

13             MR. KUNZ:  No, I guess what I'm saying is that our

14      reading of the case law is that there is no -- in situations

15      where the officers are acting within the scope of their

16      employment, there is no separate state law negligence claim

17      for failure to train and supervise.  We think that that is

18      covered by respondeat superior.

19             THE COURT:  So we'll take another look at this,

20      Mr. O'Neill.  You say these cases that you just cited say

21      exactly the opposite?

22             MR. O'NEILL:  They do not say anything about

23      respondeat superior, they simply -- they simply discuss the

24      viability of the claim and from the fact pattern it's clear

25      that there is just no issue about respondeat superior.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1    THE COURT:  I think the issue -- the issue is that

2    if a claim is made in negligence against the employee with

3    respondeat superior available, then does a claim for negligent

4    training and supervision still exist at that point?  You're

5    saying --

6    MR. O'NEILL:  I believe --

7    THE COURT:  You're saying that these cases, when we

8    look at them, will tell us the answer to that question is yes?

9    MR. O'NEILL:  Yes, your Honor.

10   THE COURT:  Mr. Kunz is telling us the answer to

11   that question is no.

12   MR. O'NEILL:  That is correct.

13   THE COURT:  Is that correct?

14   MR. KUNZ:  I think that's fair.  I mean obviously we

15   haven't read these decisions, but, you know, I could -- I

16   could see situations like if there are 12(b)(6) motions or

17   something like that, then it's possible that at that point the

18   Court hadn't decided that the officers were in fact acting

19   within the scope of their employment, so they allowed

20   discovery to proceed.

21   But I think your Honor is absolutely right that when

22   we get to this point and Plaintiff wants to put a negligence

23   claim to the jury, then he -- in situations where officers are

24   acting within the scope of their employment, he cannot also

25   put a negligent training and supervision claim to the jury.

Proceedings

1        THE COURT:  Okay.  We will -- we will take another

2    look at that.  So we will reserve on that.  I will probably

3    need until tomorrow.  This -- it's a legal question.  If

4    the -- if the -- if the claims can -- I mean, in the first

5    instance, it's a legal -- it's a legal question.

6        I ultimately don't see the training -- I'll hear it

7    separately.  I don't see the training issue as a matter of

8    fact that they're -- given Pollini's testimony, whether you

9    get anywhere on negligent training.  But you -- I don't know

10   where we are.

11       I'll hear you further.  Assuming that the legal --

12   assuming that the legal issue is resolved in Mr. O'Neill's

13   favor, we still would have to deal with maybe a marshaling of

14   the facts on supervision.

15       MR. KUNZ:  Well, the arguments would be similar to

16   what we made on the federal claim which is that all of the

17   officers testified that they were trained on-the-job

18   experience in the handling of confidential informants.  And,

19   your Honor, frankly this whole idea that officers --

20       THE COURT:  I understand negligence between training

21   and supervision.

22       MR. KUNZ:  Right.

23       THE COURT:  I don't know what Mr. O'Neill says --

24   what facts are there with regard to supervision.

25       MR. KUNZ:  I don't know actually if supervision was

Proceedings

1   actually included in either --

2          THE COURT:  I don't know, maybe I'm missing it.

3   Mr. O'Neill, did you --

4          MR. O'NEILL:  It's really training, your Honor.

5          THE COURT:  Just training?

6          MR. O'NEILL:  Right.

7          THE COURT:  So if it's only training, then there may

8   not be factual -- any factual basis for that after Pollini's

9   testimony.  They were trained the same way as your expert.

10  There doesn't seem to be any fact issue in dispute about that.

11         MR. O'NEILL:  My recollection is that Mr. Pollini

12  testified that there is training given on the handling of

13  confidential informants, it's just not given to patrol

14  officers.  And these were patrol officers.

15         THE COURT:  He also testified that all of it is in

16  the patrol guide, and it's passively understood, available and

17  that on-the-job training with respect to confidential

18  informants is a critical component of the training.

19         MR. O'NEILL:  The -- my recollection --

20         THE COURT:  And actually I think he said that on

21  direct.  Forget about what he said on cross.

22         MR. O'NEILL:  My recollection of what he said about

23  the patrol guy is the patrol guy deals exclusively with

24  administrative on confidential informants and does not deal

25  with using them in the field.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

1047

Proceedings

1       THE COURT:  Well, one of the issues here was whether

2   or not Mr. Velez was deactivated, which was one of the

3   administrative issues.

4       MR. O'NEILL:  But he wasn't.

5       THE COURT:  I understand that, but that's --

6       MR. O'NEILL:  I mean, it was made clear today that

7   he was not deactivated.

8       THE COURT:  What?

9       MR. O'NEILL:  It was made clear today he was not

10  deactivated.

11      THE COURT:  I understand that, but the point being

12  where is the negligence.  I mean, that standing alone means

13  nothing.  The argument is that it was a failure to -- one of

14  the arguments -- I think one of Mr. Pollini's claims to the

15  jury was that the use of a deactivated confidential informant

16  was improper, unless I recall something --

17      MR. O'NEILL:  No, he did criticize that.  However --

18      THE COURT:  Wasn't that one of his points?

19      MR. O'NEILL:  That was one of his points.

20      THE COURT:  Right.  And therefore that -- training

21  on that issue was made with reference to the patrol guide.

22      MR. O'NEILL:  Right, but that's not the training

23  that we're saying was deficient.  The training that was

24  deficient, how do you use a confidential informant in the

25  field, and there was no training.  That's what the defendants

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings                                    1048

1    stated.  They stated they received none.

2              THE COURT:  They received no formal training, they

3    received on-the-job training which is what Mr. Pollini

4    referenced.

5              MR. O'NEILL:  Well, what you're doing, Judge, is

6    you're crediting their testimony where they -- they --

7              THE COURT:  I'm crediting it?  There is no testimony

8    to the contrary.

9              MR. O'NEILL:  Sure there is.  The deposition

10   testimony which was read.  They asked -- they were asked if

11   they received any training and they said no.  And it was

12   only -- it was only --

13             THE COURT:  It was only when they were asked about

14   informal training that we got that answer.

15             MR. O'NEILL:  Well, training is training.  I mean,

16   the questions that they answered no to was not did you receive

17   classroom training, it was did you --

18             THE COURT:  That's why there was more than one

19   question.

20             MR. O'NEILL:  I'm not --

21             THE COURT:  There is no -- my recollection, you can

22   tell me, if you can show me by cite, whether or not they ever

23   answered the question at any time differently with respect to

24   informal on-the-job training.  If they were ever asked that

25   and said no, they never got that.  I think every time they

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1    were asked that, they said they did get it.  That's my

2    recollection.

3             MR. O'NEILL:  Yeah --

4             THE COURT:  You may have a different recollection.

5    You can make your own --

6             MR. O'NEILL:  You're right, Judge.  The only time

7    they were asked that question was, was when they were being

8    questioned by the City attorneys.  But training -- an

9    unmodified question about training does not mean classroom

10   training, it means training.

11            THE COURT:  Here's the point on Rule 50, is whether

12   or not there is a legitimate issue for the jury to decide.

13            MR. O'NEILL:  That's right.

14            THE COURT:  And on that, I don't see it.  But we

15   will check your -- first, as I said, we will reserve on that.

16   We will check your legal arguments and then we'll also hear

17   you further, if need be, tomorrow.

18            MR. KUNZ:  The next claim is the negligence

19   claim for wrongful --

20            THE COURT:  Which is the wrongful death claim.

21            MR. KUNZ:  Right.  And our chief argument there goes

22   to the duty requirement and -- here we are.  So the -- for --

23   for the first eight-line negligence wrongful death claim to

24   apply, there needs to be a special relationship, and I've got

25   a number of cites here.  But essentially -- okay, here it is.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

1050

Proceedings

1        Municipality may not be held liable for the failure

2   to provide police protection because the duty to provide such

3   protection is owed to the public at large rather than to an

4   individual question -- I'm sorry an individual -- rather than

5   to a particular individual.  That's according to Conde v. City

6   of New York, 24 AD 3d 595.

7        But there is a narrow exception that applies when

8   there is a special relationship between the Municipality and

9   its actors and the individual.

10        THE COURT:  Is that special relationship different

11   than the one that's alleged in the 1983 act?

12        MR. KUNZ:  It is.  And only because the New York

13   State law has gone into some specificity with what you need to

14   have to have this special relationship.

15        THE COURT:  Is it more or less than what's required

16   under 1983?

17        MR. KUNZ:  I think it's actually more.

18        THE COURT:  In what way is it more?

19        MR. KUNZ:  Because under the state law claims you

20   need a promise of protection, you need an overt act to provide

21   that protection, and you need reliance on the individual and

22   the individual harmed on the promise of protection.

23        So in this case -- I mean, frankly, in this case

24   there was none of that.  No one thought Anthony Velez was at

25   risk.  Anthony Velez didn't think he was at risk.  You heard

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1    that from Yolanda Young.  The officers all said they didn't

2    think Anthony Velez was at risk.  So there was no request for

3    or promise of protection.

4          There was certainly no overt acts to provide

5    protection.  We let him go.  We didn't go back to his house

6    and set up a stakeout.

7          And Anthony Velez certainly didn't rely on any

8    promise of protection because he chose to go back out after --

9    after returning safely home.

10          So, you know, frankly I think that there is a very

11   wake argument for a special duty on the part of the police to

12   protect Anthony Velez on that night.

13          THE COURT:  Mr. O'Neill.

14          MR. O'NEILL:  Your Honor, there is a duty in New

15   York State to confidential informants under the Matt Schuster

16   v. City of New York case, 5 N.Y.2d 75, which basically says

17   that the city owes a duty to people who provide information to

18   it to assist them in apprehending criminals.  So that's the

19   establishment of the duty.  There's absolutely zero

20   requirement that the person ask for police protection.

21          The claim here is not that the police department

22   provide police service.  That this is not where, you know,

23   somebody was held up or where -- where -- we're alleging that

24   the police didn't police well enough and as a result a crime

25   was committed.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings                                    1052

1          What we're alleging here is the police used

2    Mr. Velez for information, and in that process a duty has

3    arisen.  The duty is for the police to do their work.

4          THE COURT:  Which can be breached by simple

5    negligence.

6          MR. O'NEILL:  Simple negligence, your Honor, that's

7    what the claim is here.  There are rules for how to deal with

8    confidential informants and if they break those rules and in

9    doing so, cause harm, then we've made out our claim.

10         THE COURT:  Well, what Mr. O'Neill is saying is very

11   simply there was an informant-police relationship here.  There

12   doesn't seem to be much dispute there was some sort of

13   relationship between Mr. Velez and the police that -- that --

14   and it fits within the case that Mr. O'Neill references as a

15   special duty and that in fact the claim is that for various

16   reasons, including those given by Mr. Pollini, the failure to

17   do X, Y, and Z, resulted -- resulted with -- were negligent

18   and, of course, the 64-dollar question at the end that in fact

19   there was a proximate cause of the claimed injury, which was

20   theft.

21         MR. KUNZ:  Well, I think there's two problems there.

22   One is that Anthony Velez was not acting as a confidential

23   informant on this night, he was a Gun Stoppers tipster.  He

24   didn't -- he did not engage in any joint --

25         THE COURT:  The jury can find he's more than that,

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1   can't they?  There's a fact question about that.

2           MR. KUNZ:  I don't believe there is -- there can be

3   a fact question about that, your Honor.  There -- you know,

4   setting aside the technical issue about whether or not

5   paperwork was filed or not, I don't think there's any question

6   that Anthony Velez was not engaged in any confidential

7   informant, you know, operation on this night.

8           They didn't use him to get a search warrant.  They

9   didn't ask him to buy drugs for them.  He came to them with

10  information and he -- he provided a tip, which they then

11  investigated, found independent of anything he told them

12  probable cause, and then went and acted on it.  So, I don't

13  think there was --

14          THE COURT:  Well, I'm going to reserve on it.  And I

15  think there's enough to send it to the jury.

16          MR. KUNZ:  But there's just one related issue, your

17  Honor, that we just want to put down for the record, which is

18  that McLean and later on Matican -- I don't know if your Honor

19  knows what happened with the Matican case, but Matican went

20  back to state court and filed a case there, and it was

21  dismissed under the state law rules of duty.

22          And they essentially held that the actions of these

23  police officers -- of the police officers in Matican were

24  discretionary, and they were not ministerial acts of the sort

25  of McLean.  And because of that they found -- they found there

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings                                     1054

 1    was no special relationship and they dismissed the case.

 2              It's on appeal.  The First Department, I don't

 3    believe has ruled on it yet, but, I think there is case law

 4    here to essentially say that the McLean situation where the

 5    Plaintiff is citing to is different from the Matican sort of

 6    situation that has already been dismissed.

 7              THE COURT:  As I say, I'm reserving until the end of

 8    the trial; the jury may find for the Plaintiff, you can renew

 9    your argument then.  Perhaps some day there will be a question

10    certified by the Court of Appeals of Mr. O'Neill's testimony.

11              MR. O'NEILL:  Let's hope not, your Honor.

12              THE COURT:  Well, there's only one claim left.  Is

13    that right?

14              MR. KUNZ:  Yes.  State law constitutional claim

15    which, frankly, when we looked at it, it seems to be the exact

16    same standards as the federal.  The language is identical,

17    it's don't deprive citizens of life, liberty and property.

18              THE COURT:  You mean the language of the --

19              MR. KUNZ:  -- of the New York State constitutional

20    amendment to which Plaintiff is citing is the same as the

21    14th amendment.

22              THE COURT:  Which is not in and of itself

23    actionable.  It's only actionable under Section 1983.

24              MR. KUNZ:  Right.  Exactly, your Honor.  That's why

25    we believe there's no citation to an analogous state law

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Proceedings

1    provision that makes this an actionable claim.

2            (Continued on next page.)

Proceedings                              1056

1          MR. O'NEILL:  Well, that's the *Brown versus State of*

2  *New York* case which says that the presumption is that a

3  provision in the State constitution is actionable.

4          I don't think there's any question that it's

5  actionable.  I think the question is what are the standards

6  and our position is that had this case come up 20 or 30 years

7  ago, we probably would agree that the standards under the

8  State constitution or Federal Constitution are the same.

9          We've seen a real narrowing of the due process

10  protection under the Federal Constitution and I do not, you

11  know, I'm not ready to concede that the state courts would

12  follow that, that lead.

13          THE COURT:  But this is where we're in a little bit

14  of a box here.  I'm exercising my pendent jurisdiction over

15  claims that the State has recognized.

16          MR. O'NEILL:  That's correct, your Honor.

17          THE COURT:  And I can't find a single case.

18          MR. O'NEILL:  I can't find a case that articulates

19  what the due process standard is here.  I can't find a case

20  either on this -- there is *Brown versus State of New York*

21  which says that the State recognizes the claim.

22          THE COURT:  It seems to me that any such claim, in

23  any event, under New York law would have to be brought under

24  the Wrongful Death Act.  I mean, why you would want to

25  compound -- why would you want to move from a negligent

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1      standard to something else?  It sort of escapes me.

2                  MR. O'NEILL:  I wouldn't want to do that, Judge.

3      There's no question about that.  I don't know that it is --

4                  THE COURT:  I mean, we've had plenty of -- I

5      shouldn't say plenty -- there have been cases of homicide by

6      police conduct that resulted in wrongful death actions in here

7      which I believe are all brought under the Wrongful Death Act.

8                  MR. O'NEILL:  Yes, your Honor, I understand your

9      point.

10                 THE COURT:  And all of those cases, we can argue,

11     were cases where someone's life was taken by a State actor

12     without due process of law.

13                 MR. O'NEILL:  That is correct, your Honor.  I

14     understand your point.  You know how lawyers hate to give up

15     claims.

16                 THE COURT:  This is one I think you ought to

17     withdraw rather than have withdrawn for you.

18                 MR. O'NEILL:  Yes, your Honor.  Twenty-three, if I

19     could just have until the morning to --

20                 THE COURT:  I will and sometimes you're, you know --

21     there are, like there are questions in an examination you

22     shouldn't ask even though you can.  Sometimes there are claims

23     you shouldn't assert.

24                 MR. O'NEILL:  Understood.

25                 THE COURT:  But I think this is one of them and

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1  what's compelling -- look, I come here as a State Court Judge

2  and one of the bibles in, if not the bible in State Court is

3  practice jury, the Pattern Jury Instructions.  There is none.

4          MR. O'NEILL:  That's right, Judge.

5          THE COURT:  Very compelling evidence, but that no

6  such claim, separate claim exists, and probably because trial

7  lawyers have no reason to make it exist given what's available

8  to them under the existing Wrongful Death Act.

9          I don't think it's accidental.  There is a --

10  there's a real practical reason why.

11          MR. O'NEILL:  Absolutely, Judge.  The fact that it's

12  not in the PJI means the claim doesn't come up often.

13          THE COURT:  Ever.

14          MR. O'NEILL:  Well, until a few years ago, they

15  didn't have a employee discrimination pattern jury

16  instructions.  It's just starting to get in there now.

17          THE COURT:  Let's say that the due process clause

18  has been around for a few years even in New York.

19          MR. O'NEILL:  It has been.  It has been, Judge.

20  There's actually some old cases going back to the very early

21  part of the 19th -- the 18th century that discussed this in a

22  little bit more detail.

23          I understand your point and I'll think about it

24  overnight.

25          THE COURT:  Yes.  In speaking overnight, make sure

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

Proceedings

1   Michael Halas here gets your e-mail addresses.  We will try to

2   e-mail you a rough draft of a charge and if you can, before

3   you, you arrive here in the morning, e-mail back your

4   comments.

5           Here's what I, how I normally operate.  If your

6   comments follow this, this pattern, it will make it easier.

7   Working from front to back on the charge, the rough draft of

8   the charge, as opposed to trying to do it by topic, if you

9   have a specific comment, you know, objection or request with

10  respect to a specific page, then denote the page and what the

11  either objection or exception is.

12          At the end of that process, if there are charges

13  that you have, that you have requested that are not covered in

14  sum and substance in the proposed draft, indicate those

15  separately what your requested charges are.  All right?  And

16  we'll also have to go over a proposed verdict sheet.

17          Mr. O'Neill, do you have a proposed verdict sheet

18  for me?  I'm not sure.

19          MR. O'NEILL:  I thought that I had but I'll double

20  check.

21          THE COURT:  Double check and if you have a proposed

22  verdict sheet on the basis of, you know, that would include to

23  the extent folks have sent them on the assumption that all the

24  claims were in.  Now that we know that some of the claims are

25  out, those obviously have to be deleted from the proposed

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter